# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

STEVEN VANCE and TIM JANECYK, for
themselves and others similarly situated,

        Plaintiffs,

v.

INTERNATIONAL BUSINESS
MACHINES CORPORATION, a New York
Corporation,

        Defendant.

Case No. 1:20-cv-00577

Hon. Charles P. Kocoras

Magistrate Judge Gabriel A. Fuentes

## DEFENDANT IBM'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

Page

INTRODUCTION ...........................................................................................................1

BACKGROUND AND SUMMARY OF ALLEGATIONS .............................................3

    A.    The Illinois Biometric Information Privacy Act ......................................3

    B.    Plaintiffs Uploaded Photos Of Themselves To Flickr That Yahoo Later Published In The Publicly-Available YFCC100M Database .................................4

    C.    IBM Accessed Photos In The YFC100M Database—Including Plaintiffs' Photos—For Purposes Of Its Diversity In Faces Research Project .....................5

ARGUMENT ..................................................................................................................8

I.     PLAINTIFFS' BIPA CLAIMS SHOULD BE DISMISSED ...............................8

    A.    Plaintiffs' BIPA Claims Violate Illinois' Extraterritoriality Doctrine Because Plaintiffs Do Not Allege That IBM's Conduct Occurred "Primarily And Substantially" In Illinois ................................8

    B.    Plaintiffs' BIPA Claims Violate The Dormant Commerce Clause ......................11

    C.    BIPA Does Not Apply To IBM's Analysis Of Photos ..........................................14

        1.    BIPA's Plain Terms Confirm That The Statute Was Not Intended To Apply To Analysis Of Photos..................................14

        2.    The Court Should Not Follow Decisions Holding That BIPA Applies To Scans Of Photos Of Faces......................................15

II.    PLAINTIFFS' UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED..............17

III.   PLAINTIFFS' INJUNCTIVE RELIEF CLAIM SHOULD BE DISMISSED..................19

CONCLUSION....................................................................................................................19

# TABLE OF AUTHORITIES

**CASES**                                                                        **PAGE**

*ACLU v. Johnson*,
   194 F.3d 1149 (10th Cir. 1999) .................................... 13

*Am. Booksellers Found. v. Dean*,
   342 F.3d 96 (2d Cir. 2003)......................................... 13

*Am. Libraries Ass'n v. Pataki*,
   969 F. Supp. 160 (S.D.N.Y. 1997) .............................. 13

*Archdiocese of St. Louis v. Internet Entm't Grp., Inc.*,
   1999 WL 66022 (E.D. Mo. Feb. 12, 1999)................... 13

*Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.*,
   493 F.3d 841 (7th Cir. 2007) ...................................... 17

*Avery v. State Farm Mut. Auto. Ins. Co.*,
   835 N.E.2d 801 (Ill. 2005)................................. 2, 8, 10

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..................................................... 8

*Cleary v. Philip Morris Inc.*,
   656 F.3d 511 (7th Cir. 2011) ...................................... 17

*Cont'l Cas. Co. v. Am. Nat'l. Ins. Co.*,
   417 F.3d 727 (7th Cir. 2005) ........................................ 6

*Cousineau v. Microsoft Corp.*,
   992 F. Supp. 2d 1116 (W.D. Wash. 2012)................... 18

*In re DoubleClick Inc. Privacy Litig.*,
   154 F. Supp. 2d 497 (S.D.N.Y. 2001)......................... 18

*Dur-Ite Co. v. Industrial Comm'n*,
   68 N.E.2d 717 (Ill. 1946) ............................................. 8

*Ennenga v. Starns*,
   2012 WL 1899331 (N.D. Ill. May 23, 2012) ................. 8

*In re Facebook Biometric Information Privacy Litigation*,
   185 F. Supp. 3d 1155 (N.D. Cal. 2016) ...................... 16

*Faerber Elec. Co. v. Atlanta Tri-Com, Inc.*,
   1993 WL 247981 (N.D. Ill. July 2, 1993)..................... 17

*Healy v. Beer Inst., Inc.*,
   491 U.S. 324 (1989)............................................ 2, 11, 12

*Hecker v. Deere & Co.*,
　556 F.3d 575 (7th Cir. 2009) ................................................................. 6

*LaCourt v. Specific Media, Inc.*,
　2011 WL 1661532 (C.D. Cal. Apr. 28, 2011) ...................................... 18

*Landau v. CNA Fin. Corp.*,
　886 N.E.2d 405 (Ill. App. 2008) ........................................................... 8

*Midwest Title Loans, Inc. v. Mills*,
　593 F.3d 660 (7th Cir. 2010) ............................................................... 12

*Missouri Pet Breeders Ass'n v. Cty. of Cook*,
　106 F. Supp. 3d 908 (N.D. Ill. 2015) .................................................. 19

*Monroy v. Shutterfly, Inc.*,
　2017 WL 4099846 (N.D. Ill. Sept. 15, 2017) .......................... 8, 11, 14, 15, 16

*Morley-Murphy Co. v. Zenith Elecs. Corp.*,
　142 F.3d 373 (7th Cir. 1998) ............................................................... 12

*Morrison v. YTB Int'l, Inc.*,
　649 F.3d 533 (7th Cir. 2011) ............................................................... 12

*Motorola, Inc. v. Lemko Corp.*,
　2010 WL 960348 (N.D. Ill. Mar. 15, 2010) ........................................ 18

*Mount v. PulsePoint, Inc.*,
　684 Fed. App'x 32 (2d Cir. 2017), *as amended* (May 3, 2017) .................... 18

*Obi v. Chase Home Fin., LLC*,
　2012 WL 1802450 (N.D. Ill. May 15, 2012) ...................................... 19

*Patel v. Facebook, Inc.*,
　932 F.3d 1264 (9th Cir. 2019) ............................................................. 11

*Rivera v. Google, Inc.*,
　238 F. Supp. 3d 1088 (N.D. Ill. 2017) ...............................8, 11, 15, 16

*Steinberg v. CVS Caremark Corp.*,
　899 F. Supp. 2d 331 (E.D. Pa. 2012) .................................................. 18

*Stevens v. Interactive Fin. Advisors, Inc.*,
　2015 WL 791384 (N.D. Ill. Feb. 24, 2015) ........................................ 17

*Sunny Handicraft Ltd. v. Envision This!, LLC*,
　2015 WL 231108 (N.D. Ill. Jan. 16, 2015) ......................................... 18

*Welborn v. Internal Revenue Serv.*,
　218 F. Supp. 3d 64 (D.D.C. 2016) ...................................................... 19

## STATUTORY AUTHORITIES

740 ILCS 14/5(a) ............................................................................ 3, 4

740 ILCS 14/5(b)-(e). ................................................................. 3, 4, 16

740 ILCS 14/10. ................................................................. 2, 3, 4, 14, 15

740 ILCS 14/20(2). ............................................................................ 4

## ADDITIONAL AUTHORITIES

A9793, Assemb., Reg. Sess. (N.Y. 2018) ........................................... 12

S8547, Senate, Reg. Sess. (N.Y. 2018) ............................................. 12

A1911, Assemb., Reg. Sess. (N.Y. 2019) ........................................... 12

S1203, Senate, Reg. Sess. (N.Y. 2019) .............................................. 12

**INTRODUCTION**

Plaintiffs Steven Vance and Tim Janecyk allege that, in 2008 and 2011, respectively, they uploaded photos of themselves to the photo-sharing website Flickr. Dkt. 19, Second Amended Complaint ("SAC"), ¶¶ 23, 30. In 2014, Flickr's parent company, Yahoo, included Plaintiffs' photos in the "Yahoo Flickr Creative Commons 100 Million" dataset (a/k/a the "YFCC100M Dataset")—a publicly-available and widely-used online dataset that includes approximately 100 million photos and videos uploaded by Flickr users around the world, pursuant to "Creative Commons" licenses executed by Flickr users.[1] *See id.* ¶ 40. Yahoo describes the YFCC100M Dataset as "a great novel dataset [for] the computer vision and multimedia research community."[2]

In 2019, IBM—a New York corporation not affiliated with either Yahoo or Flickr—allegedly "created its own dataset (the 'IBM Dataset') from a subset of the [YFCC100M] Dataset" that "consisted of approximately one million frontal-facing images of human faces—including Plaintiffs' and Class Members' faces," and then "processed the photographs to capture the biometrics of the faces appearing therein." SAC ¶¶ 43, 44.

Although Plaintiffs do *not* allege that IBM (i) interacted with Plaintiffs or any other Illinois-resident Flickr users, or (ii) conducted any activity relevant to this lawsuit in Illinois, Plaintiffs nevertheless contend that IBM's out-of-state conduct was regulated by the Illinois Biometric Information Privacy Act ("BIPA"), and claim that IBM violated BIPA by failing to provide "the requisite notice to, or obtaining the requisite releases from," the Illinois residents whose facial images were included and processed as part of the IBM Dataset. *Id.* ¶ 46.

---

[1]  *See* yfc100m Browser, *About*, http://projects.dfki.uni-kl.de/yfcc100m.

[2]  *See* yfc100m Browser, *Welcome*, http://projects.dfki.uni-kl.de/yfcc100m/.

Plaintiffs' BIPA claims (Counts I-V) should be dismissed for three reasons. *First*, the Illinois Supreme Court has made clear that "a statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 852 (Ill. 2005) (citation omitted). BIPA conveys no such intent, and therefore the statute may regulate the conduct of New York companies like IBM only if their conduct occurred "*primarily and substantially*" in Illinois. *Id.* at 853 (emphasis added). Here, however, Plaintiffs fail to plead that IBM engaged in *any conduct whatsoever in Illinois*. Indeed, the only Illinois connection alleged is that IBM's Dataset of approximately one million mostly *non*-Illinois residents (culled from the Yahoo/Flickr YFCC100M Dataset) allegedly included publicly-available online photographs of a handful of Illinois residents as well. This plainly is insufficient to establish that IBM's conduct occurred "primarily and substantially" in Illinois. Because Plaintiffs' BIPA claims would require an extraterritorial application of the statute, the claims should be dismissed.

*Second*, application of BIPA to IBM's out-of-state conduct violates the dormant Commerce Clause, which "precludes the application of a state statute" that has "the practical effect of . . . control[ling] conduct beyond the boundaries of the State," "whether or not the commerce has effects within the State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 n.1 (1989). That would be the "practical effect" if BIPA were applied here, given Plaintiffs do not allege that IBM engaged in *any* relevant conduct in Illinois.

*Third*, by BIPA's express terms, IBM's alleged taking of "craniofacial measurements" from *photos* of faces does not violate BIPA. The statute specifically excludes "photographs" from the definition of "biometric identifier," and further provides that information "derived from" photographs is not "biometric information." 740 ILCS 14/10. IBM cannot be held liable under

BIPA for taking "measurements" from photographs where the statute specifically excludes information "derived from" "photographs."

Plaintiffs' related claims for unjust enrichment (Count VI) and injunctive relief (Count VII)—each of which is predicated on IBM's alleged violation of BIPA—should also be dismissed because Plaintiffs fail to plead that IBM violated BIPA, and for the other reasons explained below in Sections II and III, respectively.

## BACKGROUND AND SUMMARY OF ALLEGATIONS

### A. The Illinois Biometric Information Privacy Act

BIPA was enacted in 2008 to address the growing use of biometric data "in the *business and security screening sectors*" in Illinois. 740 ILCS 14/5(a) (emphasis added). The Illinois General Assembly found that "[m]ajor national corporations ha[d] selected the City of Chicago and other locations in this State as pilot testing sites for new applications of biometric-facilitated financial transactions, including finger-scan technologies at grocery stores, gas stations, and school cafeterias." *Id.* 14/5(b). Consumers had become weary "of the use of biometrics when such information is tied to finances" and were being "deterred from partaking in biometric identifier-facilitated transactions," in part because of the "limited State law regulating the collection, use, safeguarding, and storage of biometrics." *Id.* 14/5(d), (e).

BIPA addresses these concerns by regulating the collection and storage of (1) "biometric identifiers" and (2) "biometric information." The statute defines "biometric identifier" using a short, exclusive list of sources of data about a person: "'Biometric identifier' means a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." *Id.* 14/10. Other potential identifiers are then expressly excluded from the definition: "Biometric identifiers do not include writing samples, written signatures, *photographs*, human biological samples used for valid

scientific testing or screening, demographic data, tattoo descriptions, or physical descriptions such as height, weight, hair color, or eye color." *Id.* (emphasis added).

"Biometric information" is data derived from a biometric identifier: "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id.* This provision, too, contains an exclusionary clause: "Biometric information does not include information derived from items or procedures excluded under the definition of biometric identifiers"—such as "photographs." *Id.*

BIPA requires private entities that "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information" to first (1) inform the person of that collection or storage "in writing"; (2) inform the person "in writing of the specific purpose and length of term" of the collection, storage, and usage; and (3) obtain a "written release" from the person. *Id.* 14/15(b). Private entities are required to develop and publish a written policy regarding the retention and destruction of biometric data. *Id.* 14/15(a).

For negligent violations of BIPA, a plaintiff can obtain "liquidated damages of $1,000 or actual damages, whichever is greater," and for intentional or reckless violations of BIPA, a plaintiff can collect "liquidated damages of $5,000 or actual damages, whichever is greater." *Id.* 14/20(2).

**B.** **Plaintiffs Uploaded Photos Of Themselves To Flickr That Yahoo Later Published In The Publicly-Available YFCC100M Database**

Plaintiffs Vance and Janecyk are Illinois residents that uploaded photos of themselves to Flickr in 2008 and 2011, respectively. SAC ¶¶ 11, 12, 23, 30. Vance alleges that, in 2008, he uploaded a photo of himself and two family members to Flickr from his computer in Illinois (the "2008 Vance Photo"). *Id.* ¶ 23. Janecyk similarly alleges that, in 2011, he uploaded a photo of his face to Flickr (the "2011 Janecyk Photo"), but, unlike Vance, Janecyk does not allege that he uploaded the photo to Flickr while he was in Illinois or from a computer or other device that was

located in Illinois.  *See id.* ¶ 30.  Plaintiffs purport to represent a class of "[a]ll Illinois residents whose faces appear in the IBM Dataset or DiF Dataset,"[3] *id.* ¶ 58—regardless of whether the photos of their faces were taken in, or uploaded to Flickr from, Illinois.

Plaintiffs allege that, "[i]n 2014, Yahoo!, then the parent company of Flickr, released to the public over 99 million photos uploaded by Flickr users from 2004 through 2014 as part of a single, downloadable dataset called YFCC100M."  *Id.* ¶ 40.  Although Plaintiffs allege that "[e]ach image in the DiF Dataset could be traced back to the individual Flickr account to which [the image] was originally uploaded," *id.* ¶ 48, they do not allege that the images or the account include the names or any other contact information of the individuals who appear in the images.

Plaintiffs do not allege that Flickr or Yahoo has ever been affiliated with IBM.  Nor do Plaintiffs allege that IBM had anything to do with Yahoo's decision to publicly release the photographs in the YFCC100M Dataset.[4]

### C.    IBM Accessed Photos In The YFC100M Database—Including Plaintiffs' Photos—For Purposes Of Its Diversity In Faces Research Project

IBM is a New York corporation headquartered in Armonk, New York.[5]  *Id.* ¶¶ 4, 13.  In or around January 2019—*i.e.*, nearly five years after Yahoo publicly released the YFCC100M database containing Plaintiffs' photos—IBM research scientists in New York downloaded approximately one million photos (allegedly including Plaintiffs' photos) from the YFCC100M

---

[3]  The SAC does not explain how the "IBM Dataset" is distinct from the "DiF Dataset."  IBM is not aware of any difference.

[4]  Nor do Plaintiffs allege that the YFCC100M Dataset consisted primarily of images of Illinois Flickr users.  In fact, Plaintiff Vance's original Complaint alleged that "[r]esearch suggests that [only] 30 percent of Flickr images are uploaded *from the United States*," Dkt. No. 1, at ¶ 48, meaning that a much smaller percentage (likely less than 1 percent) was uploaded from Illinois.

[5]  The SAC alleges that IBM has "a regional headquarters in Chicago, Illinois," SAC ¶ 13, but does not allege that anyone in the Chicago office had anything to do with the DiF Research Project.

database to create their own database of facial images, as part of the "Diversity in Faces" research project (the "DiF Research Project"). *See id.* ¶ 43; *see also* Michele Merler et al., *Diversity in Faces*, IBM RESEARCH AI @ IBM T.J. WATSON RESEARCH CENTER (2019), available at https://arxiv.org/pdf/1901.10436.pdf (last visited April 16, 2020) (stating that the project was conducted by four researchers employed by "IBM Research @ IBM T.J. Watson Research Center, Yorktown Heights, NY")), attached hereto as Exhibit A.[6]

In their SAC, Plaintiffs quote and include images from the *Diversity in Faces* research paper, which describes the Project. *See* SAC ¶ 45 (images), ¶ 47 (quotes). The paper explains that the goal of the Project was to tackle the lack of diversity in facial recognition technology. Ex. A, at 2. Because "AI systems learn what they are taught[,] [i]f they are not taught with robust and diverse data sets, accuracy and fairness are at risk." *Id.* "Face recognition systems that are trained with only a narrow context of a specific data set will inevitably acquire bias that skews learning towards the specific characteristics of the data set." *Id.* at 4.

> The training data sets should be large enough and diverse enough to learn the many ways in which faces inherently differ. The images must reflect the diversity of features in faces we see in the world. This raises the important question of how we measure and ensure diversity for faces.

*Id.* at 2. IBM thus created "DiF"—*i.e.*, the IBM Dataset—which "provides a new data set of annotations of one million publicly available face images" that is "designed to advance the study of fairness and accuracy in face recognition technology." *Id.* at 1-2.

---

[6] The SAC quotes from and relies extensively on the *Diversity in Faces* research paper. *See* SAC ¶¶ 45, 47. It is well established that, in ruling on a motion to dismiss, the Court is permitted to consider documents that are "referred to in the plaintiff's complaint and are central to her claim," as well as documents "referenced" in the [complaint] that Plaintiffs failed to attach. *Cont'l Cas. Co. v. Am. Nat'l. Ins. Co.*, 417 F.3d 727, 731 n.2 (7th Cir. 2005); *see also Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009) (affirming trial court's decision dismissing complaint based upon consideration of approximately 900 pages of material attached to defendant's motion to dismiss because the documents were central to plaintiffs' claim).

Plaintiffs allege that photos of their faces were among the photos included in the IBM Database and analyzed as part of the DiF Research Project. SAC ¶ 43. Plaintiffs further allege that IBM "processed the photographs to capture the biometrics of the faces appearing therein." *Id.* ¶ 44. Specifically, IBM created a "'comprehensive set of annotations of intrinsic facial features that includes craniofacial distances, areas and ratios, facial symmetry and contrast, [and] skin color.'" *Id.* ¶ 47 (quoting Ex. A) (brackets in original). IBM then "disseminat[ed] [the] … DiF Dataset … to third-party researchers and private entities." *Id.*

Plaintiffs allege that, "[i]n collecting, capturing and otherwise obtaining the biometric identifiers and information of Plaintiffs and Class Members and, subsequently, disclosing, redisclosing, and otherwise disseminating those biometric identifiers and information—all without providing the requisite notice, obtaining the requisite releases or satisfying any of BIPA's other provisions that would excuse it from BIPA's mandates—Defendant IBM violated BIPA." *Id.* ¶ 49.

Critically, however, Plaintiffs do not make a *single* allegation that, in creating its Dataset or conducting the DiF Research Project, IBM had any contact whatsoever with Illinois. Although Plaintiffs and the putative class members allegedly are Illinois residents, they do not allege that they uploaded photos to IBM servers, used IBM software, services, or technology, or that they ever had any communications or interactions with IBM. Nor do Plaintiffs allege that any of IBM's alleged actions in violation of BIPA—*e.g.*, the "collecting, capturing and otherwise obtaining the biometric identifiers and information"—was conducted in Illinois.

## I.  PLAINTIFFS' BIPA CLAIMS SHOULD BE DISMISSED

### A.  Plaintiffs' BIPA Claims Violate Illinois' Extraterritoriality Doctrine Because Plaintiffs Do Not Allege That IBM's Conduct Occurred "Primarily And Substantially" In Illinois

There is a "long-standing rule of construction in Illinois which holds that a 'statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute.'" *Avery*, 835 N.E.2d at 852 (quoting *Dur-Ite Co. v. Industrial Comm'n*, 68 N.E.2d 717 (Ill. 1946)). Nothing in BIPA conveys any such intent, and, accordingly, courts in this district have held that BIPA does not regulate out-of-state conduct. *See, e.g.*, *Monroy v. Shutterfly, Inc.*, 2017 WL 4099846, at *5 (N.D. Ill. Sept. 15, 2017) ("none of BIPA's express provisions indicates that the statute was intended to have extraterritorial effect"); *Rivera v. Google, Inc.*, 238 F. Supp. 3d 1088, 1104 (N.D. Ill. 2017) (BIPA "was not intended to and does not have extraterritorial application"). Thus, to be actionable, a BIPA violation must occur *within Illinois*. *See Rivera*, 238 F. Supp. at 1100 (plaintiffs' "asserted violations of [BIPA] must have taken place in Illinois for them to win").

In *Avery*, the Illinois Supreme Court explained that a "transaction may be said to take place within a state if the circumstances relating to the transaction occur *primarily and substantially*" in Illinois. 835 N.E.2d at 854 (emphasis added). Thus, "the *majority of circumstances* relating to the alleged *violation of the [statute]*" must have occurred in the state. *Landau v. CNA Fin. Corp.*, 886 N.E.2d 405, 409 (Ill. App. 2008) (emphasis added).

---

[7] "A motion to dismiss should be granted if the plaintiff fails to offer 'enough facts to state a claim to relief that is plausible on its face.'" *Ennenga v. Starns*, 2012 WL 1899331, at *2 (N.D. Ill. May 23, 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

Here, Plaintiffs do not allege that IBM did *anything* in Illinois that is relevant to this lawsuit. For example, although Plaintiffs allege that IBM violated BIPA by "collecting, capturing and otherwise obtaining the biometric identifiers and information of Plaintiffs and Class Members and, subsequently, disclosing, redisclosing, and otherwise disseminating those biometric identifiers and information," Plaintiffs do not allege that IBM did these things *from Illinois*. Nor do Plaintiffs allege that IBM had any contact with them while they were residing in Illinois. To the contrary, Plaintiffs allege that IBM obtained the photos from a database of Flickr photos that Yahoo made publicly available *online*. SAC ¶¶ 40-43, 49.

Plaintiffs further acknowledge that IBM is a New York corporation, headquartered in Armonk, New York. *Id.* ¶ 13. The DiF Research Paper that Plaintiffs quote in their SAC—and which is therefore incorporated by reference—makes clear that the DiF Project was conducted by four IBM researchers working out of the IBM Watson Research Center in Yorktown Heights, New York. Ex. A at 1. In short, Plaintiffs do not allege that IBM engaged in a single, relevant act in Illinois.

Moreover, although Plaintiff Vance alleges that he uploaded the 2008 Vance Photo "from his computer in Illinois," he acknowledges that he uploaded that photo "*to Flickr*," which is not affiliated with IBM, and that IBM obtained it only when Yahoo published the Flickr photos *online*. SAC ¶¶ 23, 40-43 (emphasis added). Vance's mere "upload[ing]" of a photo *to Flickr* "from his computer in Illinois" fails to establish a connection between *IBM's* alleged conduct and Illinois.

Plaintiff Janecyk alleges even less of a nexus with Illinois. Although Janecyk alleges that, in 2008, he "signed up for a Flickr account in the Village of Tinley Park, Illinois," and that, three years later, he uploaded the 2011 Janecyk Photo to Flickr, *id.* ¶ 30, Janecyk conspicuously omits the *location* from which he uploaded that photo. Nor does he allege that the photo was *taken* in

Illinois. Janecyk thus leaves open the possibility that the photo was taken and uploaded to Flickr from outside of Illinois, making his claims even more attenuated from Illinois than Vance's claims.

The putative class members' claims are similarly attenuated from Illinois—the putative class consists of "[a]ll Illinois residents whose faces appear in the IBM Dataset and/or DiF Dataset," *id.* ¶ 58, *regardless* of whether the photos of their faces were taken or uploaded in Illinois, stored or processed in Illinois, or handled by an Illinois entity.

As Plaintiffs would have it, if (1) an Illinois resident took a selfie on vacation in California, (2) uploaded that photo to Yahoo/Flickr (California companies) from California using a California-based IP address, (3) Yahoo/Flickr then published that selfie in an online database accessible to anyone in the world, and (4) IBM researchers working out of lab in New York downloaded the selfie to a server in New York and took facial measurements from it, the IBM researchers' conduct would be regulated by BIPA, notwithstanding the fact that the only connection to Illinois in this scenario is the residency of the person in the photo. Thus, according to Plaintiffs, a subject's Illinois residency is—on its own—sufficient to trigger BIPA, without regard to the location of the defendant or its alleged actions.

BIPA, however, does not purport to protect Illinois residents from conduct that occurs outside of Illinois' borders. To the contrary, the Illinois Supreme Court made clear that an Illinois statute that contains no provision indicating that it is intended to apply extraterritorially—such as BIPA—applies *only* to conduct that occurs "*primarily and substantially*" in Illinois. *Avery*, 835 N.E.2d at 854. The SAC fails to satisfy this crucial nexus and therefore all of Plaintiffs' BIPA claims should be dismissed.

Plaintiffs will no doubt point to cases from this district in which courts held that, on the facts alleged in those cases, it was premature to resolve—at the motion to dismiss stage—the

question of whether the plaintiffs' claims required extraterritorial application of BIPA. But those cases are distinguishable in an important respect: in each case, the photo was allegedly uploaded *to the <u>defendants</u>' systems* from a computer or device located in Illinois. *See, e.g.*, *Rivera*, 238 F. Supp. 3d at 1101 (plaintiff's "photographs were allegedly 'automatically uploaded in Illinois to [defendant's] cloud-based Google Photos service … from an Illinois-based Internet Protocol ('IP') address"); *Monroy*, 2017 WL 4099846, at *6 ("the complaint alleges that the photo of Monroy was uploaded to Shutterfly's website from a device that was physically located in Illinois and had been assigned an Illinois-based IP address"). Thus, in each case, the defendant engaged in some BIPA-relevant interaction with Illinois-based users of its services.[8] Here, by contrast, Plaintiffs are *Flickr* users, not *IBM* users, and Plaintiffs do not allege that they ever interacted with IBM (in Illinois, or anywhere else).

## B.      Plaintiffs' BIPA Claims Violate The Dormant Commerce Clause

Like Illinois' extraterritoriality doctrine, the U.S. Constitution ensures that a state regulates only conduct that it has a substantial interest in controlling. Article I, section 8 gives Congress the exclusive power to regulate commerce "among the several states." This express grant of power implicitly "limit[s] . . . the authority of the States to enact legislation affecting interstate commerce." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 326 fn.1 (1989). The "dormant Commerce Clause" "precludes the application of a state statute" that has "the practical effect of . . . control[ling]

---

[8]    Similarly, in *Patel v. Facebook, Inc.*, 932 F.3d 1264 (9th Cir. 2019), the Ninth Circuit held that, at the class certification stage, it was unnecessary to determine whether the plaintiffs' claims implicated an extraterritorial application of the statute. The court observed that BIPA does not specify whether a violation is "deemed to occur where the person whose privacy rights are impacted uses Facebook, where Facebook scans photographs and stores the face templates, or in some other place or combination of places." *Id.* at 1276. But the plaintiffs were all Illinois Facebook users who had uploaded their photos to Facebook from Illinois, *id.* at 1268, and thus Facebook—unlike IBM here—had at least *some* relevant interactions with the Illinois resident class members.

conduct beyond the boundaries of the State," "whether or not the commerce has effects within the State"—thereby preventing "inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Id.* at 336-37, n.1.

This rule has particular application where, as here, application of the Illinois law would *displace* the inconsistent policies of New York and the vast majority of other states that have chosen *not* to restrict the conduct alleged. Indeed, the New York legislature has considered BIPA-style legislation *four* times over the past several years, but the bills have never made it out of committee. *See, e.g.,* A9793, Assemb., Reg. Sess. (N.Y. 2018); S8547, Senate, Reg. Sess. (N.Y. 2018); A1911, Assemb., Reg. Sess. (N.Y. 2019); S1203, Senate, Reg. Sess. (N.Y. 2019).

In applying the dormant Commerce Clause, the Seventh Circuit has "t[aken] a broad[] view" of what constitutes an inconsistent legal regime. *Midwest Title Loans*, *Inc. v. Mills*, 593 F.3d 660, 667-68 (7th Cir. 2010). A showing of "inconsistent *obligations*" is not required; "the *absence* of a . . . counterpart" law in another state generally demonstrates that the other state "thinks [the conduct] shouldn't be restricted in the [same] way," and it would be unconstitutional to "exalt the public policy of one state over that of another." *Id.* (emphasis added); *see also Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 538 (7th Cir. 2011) ("Some states allow gambling; others don't. Some allow fireworks; others don't. Perhaps some allow pyramid schemes. Expanding Illinois law in a way that overrode the domestic policy of other states would be problematic."); *Morley-Murphy Co. v. Zenith Elecs. Corp.*, 142 F.3d 373, 379 (7th Cir. 1998) (absent dormant Commerce Clause, "any state that has chosen a policy more *laissez faire* than Wisconsin's would have its choices stymied, because the state that has chosen more regulation could always trump its deregulated neighbor."). New York—IBM's home state, and the *only* state in which IBM is alleged to have engaged in any relevant conduct—has considered, but to date has decided *against*, passing a statute

12

regulating the collection of biometric identifiers or information. The dormant Commerce Clause precludes Illinois from overriding New York's decision to stay out of the field.

This principle is particularly important in the Internet context. "[C]ourts have long recognized that certain types of commerce demand consistent treatment," and that "[t]he Internet represents one of those areas": "Regulation by any single state can only result in chaos, because at least some states will likely enact laws subjecting Internet users to conflicting obligations." *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 181 (S.D.N.Y. 1997); *see also Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003) ("the internet will soon be seen as falling within the class of subjects that are protected from State regulation" under dormant Commerce Clause); *ACLU v. Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999). At the very least, the "massive liability brought on by conflicting applicable law could chill . . . the rapidly expanding field of Internet commerce." *Archdiocese of St. Louis v. Internet Entm't Grp., Inc.*, 1999 WL 66022, at *3 (E.D. Mo. Feb. 12, 1999). At worst, these "inconsistent regulatory schemes could paralyze the development of the Internet altogether." *Pataki*, 969 F. Supp. at 181.

Applying BIPA to IBM's New York-based research project clearly would burden interstate commerce and violate the dormant Commerce Clause. IBM's research is perfectly legal under federal and New York law, but IBM (and other research institutions and universities using the YFCC100M database for facial recognition research)[9] would be forced to stop this research if it were exposed to BIPA liability merely because the YFCC100M database might contain some small

---

[9] *See, e.g.*, Ira Kemelmacher-Shlizerman et al., *The MegaFace Benchmark: 1 Million Faces for Recognition at Scale*, UNIVERSITY OF WASHINGTON (2015), http://megaface.cs.washington.edu/KemelmacherMegaFaceCVPR16.pdf, at § 3 (explaining that the University of Washington's "MegaFace" facial recognition research project also made use of "Yahoo's 100M Flickr set").

percentage of images of Illinois residents. That is precisely the kind of burden on interstate commerce that the dormant Commerce Clause prohibits.

Again, Plaintiffs are likely to point to *Monroy v. Shutterfly*, which held that Shutterfly's dormant Commerce Clause argument was premature at the pleading stage. 2017 WL 4099846, at *7. But in *Monroy*, the court emphasized the fact that the plaintiff's "suit, as well as his proposed class, is confined to individuals whose biometric data was obtained from photographs *uploaded to Shutterfly in Illinois*." *Id.* (emphasis added). The court explained that "[a]pplying BIPA in this case would not entail any regulation of Shutterfly's gathering and storage of biometric data *obtained outside of Illinois*"; rather, "the statute requires Shutterfly to comply with certain regulations if it wishes to *operate in Illinois*." *Id.* (emphasis added). Here, by contrast, Plaintiffs do not allege that IBM engaged in any relevant "operat[ions] in Illinois." *See id.* And "applying BIPA in this case *would* [] entail [] regulation of [IBM's] gathering and storage of biometric data obtained outside of Illinois." *See id.* (emphasis added). Thus, *Monroy* actually highlights an important reason why the dormant Commerce Clause issue should be resolved at the pleading stage in IBM's favor.

## C. BIPA Does Not Apply To IBM's Analysis Of Photos

### 1. BIPA's Plain Terms Confirm That The Statute Was Not Intended To Apply To Analysis Of Photos

Plaintiffs' BIPA claims also fail because the claims are based exclusively on photos and BIPA's plain language expressly excludes both photographs and information derived from photographs. *See* 740 ILCS 14/10.

The SAC makes no mention of these exclusions. Instead, Plaintiffs rely solely on the term "scan of . . . facial geometry" in BIPA's definition of "biometric identifier." SAC ¶¶ 9, 11, 12. They contend that this term covers the alleged "facial geometric scans of individuals depicted in

approximately one million photos" that IBM obtained "from the photo-sharing service Flickr." *Id.* ¶¶ 4, 22.  They are wrong.

Plaintiffs' approach ignores the language of the statute.  In enacting BIPA, the legislature created two categories of covered biometric data: (1) original sources of information about a person ("biometric identifiers"—defined as a "retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry"); and (2) data extracted or derived from those sources ("biometric information"—defined as "information . . . based on an individual's biometric identifier").  A photograph, however, is one of the "items or procedures" specifically excluded from the meaning of "biometric identifier," and accordingly "information derived from" photographs is excluded from the definition of "biometric information."  740 ILCS 14/10.  The legislature thus went out of its way to exclude *both* photographs and information derived from photographs.  That effort would be meaningless if information derived from photographs—such as the "measurements" that IBM allegedly obtained from Plaintiffs' Flickr photos—were somehow retroactively included into the definition of "biometric identifier."

## 2. The Court Should Not Follow Decisions Holding That BIPA Applies To Scans Of Photos Of Faces

Several courts have denied motions to dismiss BIPA claims based on the application of facial-recognition technology to photos.  IBM respectfully submits that these cases were wrongly decided.

In *Monroy* and *Rivera*, for example, the courts acknowledged that "[i]t is clear that the data extracted from [a plaintiff's] photograph cannot constitute 'biometric information' within the meaning of the statute" because "photographs are expressly excluded from the definition of 'biometric identifier,' and the definition of 'biometric information' expressly excludes 'information derived from items or procedures excluded under the definition of biometric

identifiers.'" *Monroy*, 2017 WL 4099846, at *3; *see also Rivera*, 238 F. Supp. 3d at 1095. However, the courts rejected the defendants' arguments that, in light of these exclusions, scans of photos of faces do not trigger BIPA, primarily on the basis that there purportedly is an "absence of any textual support for [defendants'] interpretation." *Monroy*, 2017 WL 4099846, at *3; *see also Rivera*, 238 F. Supp. 3d at 1096 ("The problem with this argument is that there is no textual or structural clue to support it.").

IBM respectfully submits that, in so holding, the courts did not properly account for the fact that BIPA § 5 makes clear that it is intended to regulate "biometric identifier-facilitated *transactions*," such as those that occur "at grocery stores, gas stations, and school cafeterias"— *i.e.*, all intrinsically *in-person* activities. 740 ILCS 14/5(b)-(e) (emphasis added). Indeed, the *only* examples that the statute gives of the types of activities that it is intended to regulate are in-person activities. The courts also glossed over BIPA's clear intent to exclude "photographs" and information "derived from" photographs from its scope. It simply does not make sense for the Legislature to specifically *exclude* "photographs" and "information derived from [photographs]" from the definitions of "biometric identifier" and "biometric information," respectively, if the Legislature intended "information derived from [a scan of a photograph]" to be included within the definition of "biometric identifier."[10]

Accordingly, the Court should hold that BIPA does not cover the type of research that IBM is alleged to have conducted on publicly-available online photos.

---

[10] The court's reasoning in *In re Facebook Biometric Information Privacy Litigation*, 185 F. Supp. 3d 1155 (N.D. Cal. 2016), is similarly unsound. The court concluded that "'[p]hotographs' is better understood to mean *paper prints* of photographs, not digitized images stored as a computer file and uploaded to the Internet." *Id.* at 1171 (emphasis added). This reading cannot be reconciled with the commonly understood meaning of "photograph" when the statute was passed in 2008: by then, digital photography was already the norm.

## II.    PLAINTIFFS' UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED

Plaintiffs' related unjust enrichment claim should also be dismissed, for three reasons.

*First*, where "an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011); *see also Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) ("Where the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent *claim* of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well.") (emphasis in original).    That is the case here: Plaintiffs contend that IBM's conduct was "unjust" because IBM acquired their "biometric identifiers and information … without permission and in violation of Illinois law"—*i.e.*, in violation of BIPA.  SAC ¶ 108.  The unjust enrichment claim is therefore "predicated on the same allegations … that support an independent claim" under BIPA, and, therefore "resolution of the [BIPA] claim[s] against [Plaintiffs] is dispositive of the unjust enrichment claim as well."  *See Ass'n Ben. Servs., Inc.*, 493 F.3d at 855.

*Second*, although Plaintiffs vaguely (and implausibly) allege that the DiF Research Project indirectly "enriched" IBM by "improving its own for-profit facial recognition technology using the insights gleaned from the biometric identifiers and information and the algorithms trained on it," SAC ¶ 52, they do not allege that this purported enrichment caused them to suffer a corresponding economic "expense."  *See Stevens v. Interactive Fin. Advisors, Inc.*, 2015 WL 791384, at *16 (N.D. Ill. Feb. 24, 2015); *Faerber Elec. Co. v. Atlanta Tri-Com, Inc.*, 1993 WL 247981, at *3 (N.D. Ill. July 2, 1993) ("To sustain a claim of unjust enrichment, a plaintiff must show that the defendant has been unjustly enriched at the plaintiff's *expense* such as when a

defendant received requested goods and services without paying any compensation for them.") (emphasis added). Courts around the country have rejected the notion that unjust enrichment can be based on misuse of personal or private data because unjust enrichment does not apply "outside the context of an 'expense' stemming from some tangible economic loss to a plaintiff." *Cousineau v. Microsoft Corp.*, 992 F. Supp. 2d 1116, 1130 (W.D. Wash. 2012) ; *see also Mount v. PulsePoint, Inc.*, 684 Fed. App'x 32, 36 (2d Cir. 2017), *as amended* (May 3, 2017) (affirming that plaintiff failed to plead unjust enrichment in light of "plaintiffs' failure to allege specific loss or deprivation of opportunity to profit from [personal] information").[11] So far as IBM can tell, no court in Illinois has "applied the doctrine of unjust enrichment outside the context of an 'expense' stemming from some tangible economic loss to a plaintiff." *See Cousineau*, 992 F. Supp. 2d at 1130.

*Third*, Plaintiffs fail to allege facts supporting a reasonable expectation of payment from IBM. *See, e.g.*, *Sunny Handicraft Ltd. v. Envision This!, LLC*, 2015 WL 231108, at *5 (N.D. Ill. Jan. 16, 2015) (dismissing unjust enrichment claim where Plaintiffs failed to "allege factual circumstances" or "conduct" "that give rise to [] reasonable expectation of payment"); *Motorola, Inc. v. Lemko Corp.*, 2010 WL 960348, at *5 (N.D. Ill. Mar. 15, 2010) (dismissing unjust enrich claim and explaining that "with no expectation of payment for services rendered, a party can hardly claim that another has been unjustly enriched") (emphasis in original) (internal quotation marks

---

[11] Numerous other cases are in accord. *See, e.g.*, *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 525 (S.D.N.Y. 2001) (explaining that "although demographic information is valued highly … the value of its collection has never been considered an economic loss to the subject," and "we are unaware of any court that has held the value of this collected [personal] information constitutes damage to consumers or unjust enrichment to collectors"); *Steinberg v. CVS Caremark Corp.*, 899 F. Supp. 2d 331, 341 (E.D. Pa. 2012) (granting motion to dismiss unjust enrichment claim where "the plaintiffs have not shown that the [personal] information disclosures … caused them to suffer an ascertainable loss"); and *LaCourt v. Specific Media, Inc.*, 2011 WL 1661532, *5 (C.D. Cal. Apr. 28, 2011) ("Plaintiffs do not explain how they were 'deprived' of the economic value of their personal information simply because their unspecified personal information was purportedly collected by a third party.").

omitted).  Plaintiffs do not allege, for example, that their individual biometric information has independent monetary value for which they ordinarily would expect to be compensated.  *See, e.g.*, *Welborn v. Internal Revenue Serv.*, 218 F. Supp. 3d 64, 78 (D.D.C. 2016) (explaining that "[c]ourts have routinely rejected the proposition that an individual's personal identifying information has an independent monetary value," and collecting cases).  Plaintiffs merely allege that IBM used the photos of their faces along with the photos of approximately *one million* other faces to train "algorithms" which then allowed IBM to "improve its own for-profit facial recognition technology using the insights gleaned from" this information.  SAC ¶ 52.  Even if this were true, Plaintiffs have no reasonable expectation of payment under these alleged circumstances.

## III.    PLAINTIFFS' INJUNCTIVE RELIEF CLAIM SHOULD BE DISMISSED

Plaintiffs' separate cause of action for injunctive relief (Count VII)[12] also "fail[s] as it does not state a cause of action."  *Obi v. Chase Home Fin., LLC*, 2012 WL 1802450, at *4 (N.D. Ill. May 15, 2012) (dismissing injunctive relief claim because "it is apparent that injunctive relief is a remedy" and "not a cause of action."); *Missouri Pet Breeders Ass'n v. Cty. of Cook*, 106 F. Supp. 3d 908, 927 (N.D. Ill. 2015) (dismissing injunctive relief claim because it is "not appropriately considered as a separate claim for relief" and is a "remedy rather than a cause of action.").

## CONCLUSION

For the foregoing reasons, Plaintiffs' SAC should be dismissed with prejudice.

---

[12]   The SAC mislabels this claim as "Count VI," but it is the seventh count asserted.

Dated:  April 16, 2020

Respectfully Submitted,

*/s/ Stephen A. Broome*

Stephen A. Broome
*Admitted Pro Hac Vice*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90405
Telephone: (213) 443-3285
stephenbroome@quinnemanuel.com

Lazar P. Raynal
Kaitlin P. Sheehan
David Lakin
Quinn Emanuel Urquhart & Sullivan, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
Telephone: (312) 705-7400
lazarraynal@quinnemanuel.com
kaitlinsheehan@quinnemanuel.com
davidlakin@quinnemanuel.com

***Counsel for IBM***

## CERTIFICATE OF SERVICE

The undersigned attorney for Counsel for IBM hereby certifies that on April 16, 2020, the foregoing was electronically filed with the U.S. District Court Clerk, Northern District of Illinois, Eastern Division, by using the CM/ECF filing system, which will send a notice of electronic filing to all CM/ECF participants.

*/s/ Stephen A. Broome*

Stephen A. Broome
Counsel for IBM