**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STEVEN VANCE and TIM JANECZYK, | ) | |
| | ) | Case No. 20 C 577 |
| Plaintiffs, | ) | |
| | ) | District Judge: Charles P. Kocoras |
| v. | ) | |
| | ) | Magistrate Judge: Gabriel A. Fuentes |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORP., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

In this matter coming before the Court on referral for discovery supervision (D.E. 105, 106), the Court will proceed to decide plaintiffs' first (D.E. 73) and second (D.E. 92) motions to compel.

## BACKGROUND

This matter is a putative class action invoking federal diversity jurisdiction and alleging violation of the Illinois Biometric Privacy Act ("BIPA"), 740 ILCS § 14/1 et seq. Plaintiffs Steven Vance and Tim Janecyk had accounts with a photo-sharing service known as Flickr and uploaded photos of themselves and/or their family members to the service; Vance claims he did so in 2008, and Janeczyk claims he did do in 2011. Memorandum Opinion (D.E. 48) at 2. Yahoo!, Flickr's parent company at the time, subsequently made Vance's photo available to defendant International Business Machines Corp. ("IBM") in 2014 when Yahoo! released over 99 million photos in a single, downloadable dataset ("Flickr Dataset"), and plaintiffs allege that IBM used the Flickr Dataset to create its own dataset (the "IBM Dataset") comprised of more than one million front-facing images of human faces. *Id.* at 2. From each image, IBM allegedly extracted 68 key-points

and at least ten facial coding schemes, such as craniofacial distances, craniofacial areas, craniofacial ratios, facial symmetry, facial regions contrast, skin color, age prediction, gender prediction, subjective annotation, and pose and resolution. *Id.* Plaintiffs allege that from the IBM Dataset, IBM extracted information to create another dataset that it labeled "Diversity in Faces" ("DiF Dataset") and then disseminated. *Id.* Each image in the DiF Dataset could allegedly be traced back to the individual Flickr account to which it was originally uploaded. *Id.* Based on these facts, plaintiffs filed the instant class action complaint alleging various BIPA-related claims and two other state-law claims. *Id.* at 3. After the district court ruled on IBM's motion to dismiss, *id.*, plaintiffs filed a Third Amended Complaint (D.E. 63) pleading BIPA claims including counts relating to IBM's alleged collection, sale, dissemination and data storage or protection practices, along with an unjust enrichment claim and a claim pleaded as negligent spoliation of evidence. These claims, as broadly described, survived another motion to dismiss. (D.E. 111.) The spoliation count, Count VIII, alleges that after IBM knew of the lawsuit over the DiF Dataset, IBM deleted, destroyed or discarded relevant electronically stored information ("ESI") including an email account concerning the DiF Dataset and work related to it ("the DiF Email Account"), along with a hard drive storing the Flickr Dataset. *Id.* ¶ ¶ 158-74. IBM answered the Third Amended Complaint on September 14, 2021. (D.E. 119.)

As for the specific circumstances of disclosure or dissemination of the alleged BIPA-covered information, plaintiffs have alleged that it was disclosed to third parties who were not identified specifically (i.e., by name) in the Third Amended Complaint. The Court will not discuss the Third Amended Complaint's broad description of these third parties, and not even in general terms, because the information, contained in Paragraphs 37 and 38 of the Third Amended Complaint, was filed under seal per a motion asserting that the information should be placed under

seal because it was obtained through discovery designated as "confidential" under the protective order in effect in the case. (D.E. 61). As a result, at least for now, no member of the public can know anything about the third parties to whom the information was disseminated, notwithstanding plaintiffs' resort to the public judicial system to try to obtain a resolution of their dispute with IBM. The sealed nature of this information is not before the Court today, but perhaps the issue will arise at some point.[1]

In the meantime, discovery proceeded and led to the two motions to compel now before the magistrate judge. In the first (D.E. 73), plaintiffs seek to compel responses to certain Rule 33 interrogatories and Rule 34 document requests. In the second (D.E. 92), plaintiffs seek more compelled interrogatory responses and other discovery arising from the destruction of evidence as alleged in Count VIII.

---

[1] The motion to seal asserted that the protective order allows parties to file under seal discovery materials designated as "confidential" under the order by complying with Local Rule 26.2 (D.E. 61), but the very same paragraph cited in the motion makes clear that by itself, the protective order does not authorize the filing of any document under seal. Amended Agreed Confidentiality Order (D.E. 68) ¶ 9. As for Local Rule 26.2, it allows sealing of filed documents "for good cause shown," but Seventh Circuit law continues to control what may be sealed. That Seventh Circuit law is restrictive, and not permissive, on this point. *See Bond v. Utreras*, 585 F.3d 1061, 1073 (7th Cir. 2009) (noting that public "has a presumptive right to access discovery materials that are filed with the court"); *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 545-46 (7th Cir. 2002) (stating that filed discovery documents "that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality . . . In civil litigation only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence (such as the name of a minor victim of sexual assault) is entitled to be kept secret"); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 567-68 (7th Cir. 2000) ("Many a litigant would prefer that the subject matter of a case . . . be kept from the curious (including its business rivals and customers), but the tradition that litigation is open to the public is of very long standing."); *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945-46 (7th Cir. 1999) (warning courts not to allow parties "to seal whatever they want" and urging them to apply "a neutral balancing of the relevant interests" in connection with any good-cause determination presented by a motion to seal).

## ANALYSIS

The governing law over the scope of all discovery in this case is per Fed. R. Civ. P. 26(b)(1): The discovery sought must be relevant to any claim or defense, and it must be proportional to the needs of the case. The magistrate judge has broad discretion to manage discovery, *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1115 (7th Cir. 2013), and discovery will be managed in view of the need to secure the just, speedy, and inexpensive determination of this matter. Fed. R. Civ. P. 1. In this case, proportionality poses major challenges, because plaintiffs want discovery from a large number of employees of a large corporate defendant on the broad issue of the assembly of certain biometric data as part of one or more projects the defendant, IBM, developed during all or some of the relevant time frame. In ruling promptly and concisely, the Court is doing its best to promote efficiency in the case, Fed. R. Civ. P. 1, while considering proportionality and a balancing of the interests in the case.

## I. Plaintiffs' First Motion to Compel

### A. Interrogatory Responses

#### 1. Interrogatory No. 2

Plaintiffs have twice argued in their motion papers that defendant provided "no answer" (Plaintiffs' First Motion to Compel ("First Motion"; D.E. 73) at 7) or "refus[ed] to answer" (Plaintiff's Reply in Support of Their First Motion to Compel ("First Reply"; D.E. 86) at 13) this interrogatory, which asks for a listing of persons with knowledge of allegations in the pleadings. But as IBM points out, it did not provide "no answer" and did not "refuse to answer."[2] Instead, it

---

[2] The Court respectfully asks plaintiffs to take greater care in their representations about what is actually contained in discovery responses for which plaintiffs seek compelled supplementation. Taking plaintiffs literally, i.e., by assuming that IBM ought to be compelled to supplement because it provided nothing in response to Interrogatory No. 2, the Court could decline to grant plaintiffs any relief at all. But the Court is in the business of promoting a just resolution of civil matters. Fed. R. Civ. P. 1.

listed a grand total of four people (IBM employees John R. Smith, Michelle Merler, Rogerio Feris, and former IBM employee Nalini Ratha), along with "unknown individuals" at four third parties (including Flickr) and "the research entities that received the DiF Dataset." Defendant's Interrogatory Resp. No. 2 (D.E. 74-11) at 8-9. Merler, Ratha, Feris, and Smith are the authors of a February 22, 2019 published research paper ("the DiF Article"). First Motion, Exh. 6 (D.E. 73-6). Smith, at least, is also involved in the authorship of a public blog ("the DiF Blog") about the DiF Dataset research project. Defendant's Response in Opposition to Plaintiffs' First Motion to Compel ("First Response"; D.E. 83) at 13. Merler, Ratha, Feris and Smith also are identified as the authors of a slideshow "lunch and learn" presentation, apparently internal to IBM, about their DiF Dataset research. First Motion, Exh. 8 (D.E. 73-8) at 1. One of the slides states that "[t]his information will help to inform AI researchers and developers (including IBM's products) in their efforts to build facial analysis systems that are accurate and fair." *Id*. at 3. In another curiosity, IBM produced a 2018 email string in which Merler, Ratha, Feris, and Smith appear, with what appear to be email addresses that contain the word "Watson," which plaintiffs associate with "Watson Face API," an IBM commercial facial recognition product. First Motion, Exh. 3 (D.E. 73-3). The question before the Court is not whether IBM's identification of additional persons in response to Interrogatory No. 2 must be limited to persons with "relevant" knowledge. *See* First Response at 13. The question under Rule 26(b)(1) is whether IBM's identification of additional persons with knowledge, period, of the allegations in the pleadings would constitute relevant and proportional discovery.

For its part, IBM has sworn that "neither its research relating to the DiF Dataset nor the DiF dataset itself, was used in any IBM 'facial recognition products, offerings, technologies, algorithms, software [or] services,'" and that "[t]he *Diversity in Faces* project was research

oriented, as it sought to advance the study of the factors contributing to bias in facial recognition and artificial intelligence and was not used to improve any of IBM's commercial offerings." Interrogatory Response Nos. 13, 14 (D.E. 73-11) at 18-19. As for the Watson emails, IBM states that they predate the start of the "Diversity in Faces" project by nine months and relate to a separate and later abandoned research project, known by the acronym "MAFIA." First Response at 14 n.6. MAFIA stood for "Million Aligned Face Identify and Attributes" and was only a "potential" research project conceived in the spring of 2017 (before publication of the *Gender Shades* article and more than a year before the DiF research began) and abandoned in March 2018, so that no MAFIA dataset was ever created. First Response at 8. IBM described MAFIA as a dataset that, again, was never actually created but only proposed as a response to the *Gender Shades* study. *Id.* The *Gender Shades* study evaluated for accuracy three commercial "gender classifier" products including "IBM's Watson Visual Recognition API," and it found that IBM's product "perform[ed] best on lighter male faces,", with an error rate of 0.3%, and "worst on darker female faces," with an error rate of 34.7%. First Motion, Exh. 1 (D.E. 73-1) at 8-9. Although IBM's conception of MAFIA came before the publication of *Gender Shades*, the discovery record leaves little doubt that at least by 2018, IBM's work on MAFIA had the problem of gender and ethnic bias in its products in sharp focus. First Motion, Exh. 3 ("We have several ongoing projects to address dataset bias in facial analysis"). IBM does not disagree. *See* First Response at 8 (describing MAFIA as "the proposed million-scale dataset referenced in IBM's response to *Gender Shades*"). IBM's briefing does not describe the *Gender Shades* findings as a blow to its commercial efforts to market facial recognition products, but the Court will draw that reasonable inference. In addition, IBM notes that it produced spreadsheets identifying additional IBM employees who requested access to the DiF Dataset, although "IBM is not going to list all of the IBM employees

who work on IBM's commercial facial recognition technologies and products." 4/27/21 IBM Discovery Correspondence (D.E. 73-5) at 6. Because the Diversity in Faces was not used to develop IBM commercial products, IBM argues, the "[i]dentification of IBM's employees who work on those products is harassing, seeking information that is not relevant to Plaintiffs' claims or IBM's defenses, and is not proportional to the needs of the case." 4/27/21 Discovery Correspondence at 6-7.

Divining the competing narratives here is not difficult. Plaintiffs see IBM's response to the *Gender Shades* article along a continuum, beginning with IBM's self-described MAFIA "proposal" and moving toward the Diversity in Faces research, which IBM says was conceived in the fall of 2018. First Response at 8. Plaintiffs see the involvement of Merler, Ratha, Feris, and Smith – the four current or former IBM employees whom IBM identified in response to Interrogatory No. 2 – in the Watson product in 2018, in IBM's response to the *Gender Shades* study and its "proposal" for MAFIA, and in the DiF Dataset research as inter-related, meaning these projects are related to IBM commercial product development. Plaintiffs would like the Court to conclude that, for purposes of delineating the scope of discovery, IBM's business objectives included developing and marketing commercially successful facial recognition technology and products, so that IBM's research from at least early 2018 – including the Diversity in Faces research – had to be connected to IBM's commercial product development. To conclude otherwise would be to indulge in an untenable assumption that the Diversity in Faces research had no business purpose at all and was perhaps directed at the betterment of humankind, plaintiffs' theory would argue. IBM, on the other hand, wants the Court to view MAFIA and the DiF Dataset research as separate and unrelated, or at least not related enough to support the conclusion that the association of Merler, Ratha, Feris, and Smith with MAFIA and the company's response to *Gender*

*Shades* in 2017 and 2018 meant that these Diversity in Faces researchers or their research in late 2018 and 2019 had any connection to IBM commercial product development. Because MAFIA came to an end as a concept in March 2018 and Diversity in Faces did not begin until late 2018, IBM argues, the two projects were not related, and the connection between Merler, Ratha, Feris, and Smith and (1) the Watson commercial product and (2) MAFIA and the company's response to *Gender Shades* does not mean that the identities of anyone else involved in commercial product development or MAFIA ought to be disclosed in response to Interrogatory No. 2.

The Court is not going to resolve the competition between these two narratives today, but the discovery rules at least allow plaintiffs to explore whether any evidence might exist to prove their version, namely that the DiF Dataset and related research were used to improve, develop, or somehow affect IBM commercial facial recognition products. But plaintiffs' discovery must fall within the bounds of proportionality. Accordingly, IBM will not be forced to identify "all" persons who ever heard of the Diversity in Faces research or the DiF Dataset, and nor must IBM identify all of its employees who work on facial recognition technologies and products. Plaintiffs' motion is granted in part as to Interrogatory No. 2 insofar as IBM is required to supplement its response by identifying all persons who:

- worked on any IBM commercial facial recognition product (including "Watson Face API") *and* who received or had access to the DiF Dataset in whole or in part;

- gave any instruction or direction to Merler, Ratha, Feris, and Smith, prior to publication of the DiF Article, about the drafting or preparation of the DiF Article or about the research to be incorporated or discussed in it, and/or reviewed, edited, revised, approved, commented upon the DiF Article before its publication;

- served as direct reports at IBM for Merler, Ratha, Feris, Smith from January 1, 2017 to January 22, 2020 (the last business day before this lawsuit's filing date); and

- were the persons who reported directly, from January 1, 2017 to January 22, 2020, to IBM's Ruchir Puri and Chiao-fe Shu, whom plaintiffs identify as involved at a high

managerial level in the development of IBM's commercial facial recognition products including those with the brand name of "Watson."

2. **Interrogatory Nos. 13 and 15**

As the Court did with respect to Interrogatory No. 2, the Court will allow plaintiffs broad discovery into the connection between the DiF Dataset research and IBM product development. But Interrogatory No. 13's call for identification of all persons involved in virtually any aspect of its facial recognition commercial product development, marketing, or even sales is disproportionate to the needs of the case. Per IBM's forthcoming supplement to its response to Interrogatory No. 2, plaintiffs will have the names of the top management levels in IBM's development of these products, in the persons of Puri, Shu, and those reporting directly to them. The Court does not see reaching to lower-level marketing or sales persons, or line managers, as proportionate to the needs of the case at this time. As for IBM's response to Interrogatory No. 15, again the Court rejects IBM's effort to avoid providing a substantive answer to this interrogatory by reasserting its claim that the DiF Dataset was used only for "research" and not product development, or that the issues open for discovery in this case muse be limited strictly to the Dif Dataset. *See* Interrogatory Response No. 15 (D.E. 71-11). Plaintiffs are entitled to test that assertion. The motion is denied as to Interrogatory No. 13 but granted as to Interrogatory No. 15 for the time frame of January 1, 2017 through January 22, 2020.

B. **Document Request Responses**

1. **Document Request No. 5**

The Court already has had to undertake considerable effort to obtain a working grasp of the conceptual issues in this case and the matters at issue on the motions to compel. Fundamental to those matters are the actual discovery requests and responses. The Court needs the actual requests and responses in order to rule definitively; the plaintiff's reproduction of them in the

motion papers has proven so far not entirely reliable. *See supra* n. 1. For whatever reason, plaintiffs omitted pages 11 through 17 of defendant's document responses, so the Court cannot review Request No. 5 and its response. The Court therefore denies the motion without prejudice as to this request. That said, plaintiffs should be mindful that if their representations about the response are correct, *see* First Motion at 8, then IBM stated that it has no responsive documents and is therefore not withholding any responsive documents. Ordinarily, a propounding party's disbelief of this type of assertion is not a ground for a compelled supplementation, insofar as the responding party knows that if it has further responsive documents but is refusing to produce them on some ground, it must say so. Based on what plaintiffs have represented, the Court would be disinclined to grant a motion to compel a supplemental response to Request No. 5.

### 2. Document Request Nos. 15-16, 63

The Court sees two issues with IBM's responses to these three BIPA-related requests. First, IBM has said it will produce non-privileged, responsive documents "relative to the Datasets," Document Request Responses 15-16, 63 (D.E. 73-12) at 18, 35, and plaintiffs characterize this limitation as restricting the responses to only those documents relevant to the "DiF Dataset." First Motion at 8. Second, the parties are in disagreement over the applicable time frame of the requests, with plaintiffs asking IBM to go back to the start of 2015 for a five-year lookback, and IBM wanting to limit the time frame to effectively a two-year lookback, to early 2018. As to the first issue, the Court could not easily determine what IBM meant by the "Datasets," but its discovery correspondence indicates it does wish to limit responsiveness to the DiF Dataset. 1/29/21 Discovery Correspondence at 10-12. As explained, the Court disagrees with the premise behind that limitation, for purposes of discovery scope under Rule 26(b)(1). Accordingly, the motion is granted and the requests are to be construed to cover not just the DiF Dataset but any facial

recognition dataset in which IBM was involved conceiving, proposing, developing, or abandoning. Further, the time frame is January 1, 2017 through January 22, 2020, a three-year lookback that includes the time frame during which IBM began considering the development or proposed development of MAFIA as it formulated a response to the *Gender Shades* study. Other than plaintiffs' generalized assertions that relevant material might be found going back to 2015, the Court views that sort of exploration as disproportionate under the facts each party has proffered.

### 3. Document Request Nos. 33-38, 41, and 66

Several of these document requests are mirror images of certain interrogatories, and in some cases, they propose wasteful and duplicative discovery. For example, the compelled responses to Interrogatory No. 2 represent the Court's effort to ensure that plaintiffs receive relevant and proportional discovery on the persons behind IBM's facial recognition product development, so Request No. 33's demand for all documents identifying or describing such persons, and Request No. 34's demand for documents identifying such persons' physical locations, is duplicative, and the motion is denied as to those requests. Similarly, Request No. 35 seeks "documents identifying or describing" IBM's biometric software products. Although the Court could not find an interrogatory seeking identification of these products (as the copy of the interrogatory responses supplied in this matter also was truncated and missing pages), the Court presumes that an interrogatory was or could be propounded to obtain this discovery. The motion is denied as to Request No. 35.

The motion is granted as to Request Nos. 36 and 37, as IBM's responses to those requests were to suggest once again that it need not respond in full because the only matter discoverable in this case is subject matter directly related to the DiF Dataset. The time frame for IBM's compelled responses to these requests is January 1, 2017 through January 22, 2020. Request No. 38 is not

quite the mirror image of Interrogatory No. 15 because it asks for documents related to the issues or problems IBM identified with its facial recognition products. The motion is granted as to Requests 36, 37 and 38 for the aforesaid time frame.

Finally, Request No. 66 seeks all documents related to the current or prospective "monetization" of IBM's facial recognition products, and IBM seeks to limit its response to only the DiF Dataset. Here, the Court is concerned that the concept of "monetization" of a particular product or line of products is extremely broad, and could include virtually any document in the sales or marketing departments of IBM as to these products. Discovery at that breadth is not proportionate. For purposes of at least this document request, the motion is denied, and IBM's objection stating that it will produce only such responsive documents as those relating to monetization of the DiF Dataset is sustained. IBM should exercise care that to the extent the DiF Dataset indeed did relate to the development, marketing or sale of IBM facial recognition products, documents relating to the "monetization" of that research would be discoverable. But on the current record, the motion is denied as to Request No. 66.

## II.     Plaintiffs' Second Motion to Compel

In the second motion to compel (D.E. 92), plaintiffs seek compelled production of additional documents responsive to Document Request Nos. 1-4 from plaintiffs' second set of production requests (D.E. 92-6), and a compelled supplemental response to Interrogatory No. 2 (D.E. 92-2). These discovery requests revolve around plaintiffs' allegations in Count VIII that IBM, after knowing of the lawsuit over the DiF Dataset, deleted, destroyed or discarded the DiF Email Account and a hard drive storing the Flickr Dataset ("the XIV Hard Drive"). Plaintiffs challenge the sufficiency of IBM's responses to these spoliation-related discovery requests. Plaintiffs also ask the Court to characterize IBM's withholding of purportedly privileged

documents, without having placed them on a privilege log, as a waiver of the privilege, and plaintiffs also challenge the 82-page log that IBM has produced.

### A.     Document Request Nos. 1-4

We begin with the premise, confirmed by IBM, that "IBM does not dispute the propriety of plaintiffs' spoliation related requests only insofar as they seek *non*-privileged documents or information." IBM's Response in Opposition to Plaintiffs' Second Motion to Compel ("Second Response"; D.E. 95) at 9. IBM insists that it already has produced all of its responsive non-privileged documents with respect to Request Nos. 1-4. *Id.* at 9-10. The parties are at issue over whether additional documents, claimed by IBM to be privileged but not yet placed on a privilege log, must be produced. They also argue over the sufficiency of IBM's 82-page amended privilege log and whether waiver of the privilege ought to be a consequence of the log's insufficiency.

### 1.     Privilege Claims Concerning Post-January 2020 Communications About Spoliation of the DiF Email Account and the XIV Hard Drive

As a preliminary matter, the Court rejects plaintiffs' request for a finding that IBM waived privilege by not logging spoliation-related documents now claimed as attorney-client privileged or work product. Unlike in *Rao v. Board of Trustees of the Univ. of Illinois,* No. 14 C 66, 2016 WL 6124436 (N.D. Ill. Oct. 20, 2016), the withheld materials about spoliation originated after the start of the litigation. The *Rao* opinion does not set forth precisely when the withheld materials were created in that case, but insofar as they were "investigative files" from internal investigations done for the party university by outside counsel, the Court infers that they predated the litigation. Here, the issue is discoverability of privileged communications related to spoliation, and not law firm investigative files, and plaintiffs say they seek post-litigation communications about spoliation because the spoliation occurred after plaintiffs sued on January 22, 2020 in this case and before IBM notified plaintiffs of the spoliation in January 2021; by then, IBM internally had known

13

of the destruction of the DiF Email Account since at least March 2020 and of the destruction of the XIV Hard Drive since at least June 2020.  Plaintiffs' Reply in Support of Their Second Motion to Compel ("Second Reply"; D.E. 97) at 7.  In addition, in *Rao*, the magistrate judge noted that she had ordered the two investigative files produced in an order dated August 3, 2016, about a month before the then-existing September 7, 2016 discovery cutoff, but the producing party did not timely seek to resolve its privilege objections and allowed discovery to close, leading the magistrate judge to decide that "[t]he case must move forward."  *Rao,* 2016 WL 6124436 at *7. Here, by contrast, the district court suspended the discovery cutoff for the express reason that the pending motions to compel needed to be resolved.  (8/19/21 Order, D.E. 98.)  The harsh result of privilege waiver in *Rao* may have been appropriate for that case, but not for this one.  Blanket privilege waiver as a remedy for a deficient privilege log is not a favored remedy in this judicial district.  *See Muro v. Target Corp.*, 250 F.R.D. 350, 360 (N.D. Ill. 2007) (citing *Am. Nat'l Bank & Trust Co. of Chicago v. Equitable Life Assurance Soc'y of U.S.*, 406 F.3d 867, 869 (7th Cir. 2005)), *aff'd*, 580 F.3d 485 (7th Cir. 2009).  Other than *Rao*, plaintiffs offer no authority for blanket privilege waiver where no log was produced after the parties agreed they would not log post-complaint communications, but where those communications were alleged to have come within the scope of discovery under Rule 26(b)(1) because of events transpiring after discovery.  As stated further below, the Court believes some of these communications may indeed need to be logged, but the Court will not find that all privilege claims over them are now waived.

As for Document Request Nos. 1-4, then, the Court partially grants and partially denies the motion.  IBM must produce any non-privileged documents responsive to these requests, even if they are dated after January 22, 2020, to the extent IBM has not already done so.  As for the documents it withholds on the basis of privilege, but has not logged, the motion's request seeking

disclosure of all of them is denied. But we need to discuss further the question of what should and should not be logged.

The Court does not agree with IBM that plaintiffs' counsel's agreement, in a series of February 2021 discovery conferences (*see* Second Response, Exh. 10 (D.E. 95-10)), not to have the parties log post-litigation attorney communications operates to foreclose forever plaintiffs' effort to discover those documents now. These conferences occurred just days after IBM made disclosures about the destruction of the DiF Email Account, apparently under the watch of a witness and employee named John Smith, and about the overwriting of the XIV Hard Drive, apparently at the direction of a witness and former employee named Mandis Beigi. There is and has been time in this litigation for a careful consideration of Rule 26(b)(1) proportionality of the discovery of these communications, and of the preparation of a supplemental privilege log, notwithstanding IBM's concerns that plaintiffs were aware of IBM's admitted spoliation for more than eight months. *See* Second Response at 11. Count VIII is now squarely a part of this litigation, and the Court will not lift Rule 26(b)(5)'s privilege log's requirement for spoliation-related matters occurring after suit. Instead, the Court will apply Rule 26(b)(5) with the proportionality concerns of the 2015 amendments to Rule 26(b)(1) in mind, and IBM is ordered to log not all of the post-January 22, 2020 spoliation documents over which IBM claims privilege or work-product protection, but only those falling in the below categories or descriptions:

- The document retention order or "DRO" sent to IBM employees in late January 2020, and not including other DROs dating back to 2015 as requested.[3]

---

[3] The requirement that any of these documents be logged does not foreshadow the Court's ruling as to the adequacy of the supplemental log's document descriptions establishing the basis for the privilege. Nor does today's ruling foreshadow whether the Court will or will not find an *in camera* review to be necessary, or whether the Court will agree with the claims of privilege. It is worth noting now, though, that document retention orders containing an attorney's legal advice to corporate employees regarding document preservation are considered generally to be within the privilege and not discoverable. *Muro*, 250 F.R.D. at 360. Whether the Court exercises its discretion to conduct an *in camera* review is a matter for the Court's discretion, and plaintiffs should not assume that they automatically will be entitled to such a review.

- Any other communications received by John Smith about document preservation in this case before the deletion of the DiF Email Account on March 7, 2020.

- Any communications to or from John Smith, or his agents, subordinates or superiors, between March 7, 2020, and September 9, 2020, containing information the sender intended to be transmitted to any of them about deletion of the DiF Email Account, including but not limited to why the March 7 automated deletion was not prevented and how or whether a subsequent automated deletion of information from the DiF Email Account might be prevented.

- Any communications to and from John Smith, or his agents, subordinates or superiors, containing information the sender intended to be transmitted to any of them, after the September 9, 2020 deletion of the DiF Email Account, including but not limited to why a second automated deletion was not prevented and how or whether a subsequent automated deletion of information from the DiF Email Account might be prevented.

- Any communications to or from Mandis Beigi, or his agents, subordinates or superiors, containing information the sender intended to be transmitted to any of them, before the deletion or destruction of data on the XIV Hard Drive on June 11, 2020.

- Any communications to or from Mandis Beigi, or his agents, subordinates or superiors, containing information the sender intended to be transmitted to any of them, after the June 11, 2020 deletion or destruction of data on the XIV Hard Drive, including but not limited to why such deletion or destruction was not prevented and how or whether a subsequent deletion or destruction of data relevant to this lawsuit might be prevented.

- Any communications whose content indicates that any counsel for IBM, either in-house or retained counsel, advised IBM to destroy or discard data or information from the DiF Email Account or the XIV Hard Drive, or otherwise participated in such destruction or discarding.

The above list of document categories for the supplemental log is notable for what is not on the list. The Court is not requiring IBM to log its privileged communications about the impact of the destruction or deletion of the DiF Email Account or the XIV Hard Drive on the litigation, or about any tactical or strategic decision to be made in the litigation as a result of the spoliation.

---

*Washtenaw County Employee Retirement Sys. v. Walgreen Co.*, No. 15 C 3187, 2020 WL 3977944, at *6 (N.D. Ill. July 14, 2020). At the same time, the party logging the communications must exercise care to ensure that the Court has adequate information to determine, without reviewing the underlying documents, that the withholding party has adequately asserted a basis for withholding the documents and their purportedly privileged attachments. *See generally id.* at *4-6.

Nor is IBM being required to log communications about attempts to recover the lost material, to mitigate against loss of the material, or to perform any other act in the litigation (other than diagnosis and prevention of losses of responsive data) in response to the data loss. Similarly, IBM is not being required to log its privileged communications about disclosure of the data loss to plaintiffs, or about what to communicate or not communicate to plaintiffs about the data loss. All of the above matters are in the heartland of attorney-client communications that one might typically expect in a case like this, after initiation of an active lawsuit, that will contain the core of the attorney's privileged legal advice about a matter as concerning as a data loss after communication of a DRO. The exception to the Court's ruling relieving IBM from logging these communications would apply, of course, if any of the communications disclosed attorney advice to spoliate or attorney participation in the spoliation. IBM vigorously denies that its counsel had any role in the spoliation of evidence. The Court's ruling today takes no position on that issue, except to require a limited compliance with Rule 26(b)(5) as to privileged documents that relate purely to the facts of the data loss and to measures to prevent another data loss – along with anything else, *if it exists*, that would tend to disprove IBM's assertion that its counsel simply were not involved in the deletion of the DiF Email Account or the overwriting of the XIV Hard Drive.

IBM is ordered to produce the supplemental privilege log by the close of business on November 5, 2021.

### 2. The Adequacy of IBM's April 2021 Amended Privilege Log

Plaintiffs have concerns about the broad descriptions setting forth the privilege claims behind the withholding of the items on this April 26, 2021 amended privilege log (D.E. 92-7), and they are particularly concerned about the adequacy of privilege claims over various attachments to the items on the log. The Court agrees that the vast majority of the item descriptions have a

17

boilerplate appearance, and that many of the items are communications not involving an attorney. Nonetheless, an attorney need not be on the communication in order for it to be privileged, insofar as employees may internally disseminate legal advice the company has received from inside or outside counsel, and as long as the communication does not waive the privilege by reaching a third party. However, a bald assertion that a document contains "legal advice" is ordinarily insufficient for this Court to consider the entry an adequate assertion of privilege. In reviewing the items on the 82-page log, the Court noted that many of them described the communications as containing "legal advice" but then went further and disclosed that the advice related to or concerned specific matters, such as the research project's legal and regulatory compliance, or relevant policies about those matters. These descriptions were mind-numbing in their repetitiveness on the log, but that is not to say they were inadequate; a further specification of the nature of the legal advice, or of the regulatory or legal compliance regime, would risk disclosing the substance of the legal advice. The Court cannot agree with plaintiffs that the descriptions on the log, as to email communications, were too vague or too broad to support the assertion of privilege, and the Court will not hold that the privilege was waived as to any of these items, or that supplementation of any of these items is necessary. Unfortunately, the 82-page log does not number the items, making it difficult for the Court to point out specific items, but it should suffice to say that the Court is declining to require IBM to revisit descriptions such as these:

- "email between IBM DiF research personnel, IBM personnel, IBM in-house counsel, and IBM outside counsel seeking legal advice regarding legal and regulatory compliance for research project"; and

- "Emails exchanged between IBM DiF research personnel, IBM personnel and IBM in-house counsel seeking or providing information for legal advice regarding research project policies, licenses, and requirements."

*See* D.E. 92-7, passim; *see also Washtenaw*, 2020 WL 3977944, at *4-6 (discussing generally the information privilege log item descriptions should contain).

As to the attachments to certain of those emails, the descriptions for the most part reveal no independent description of the attachments themselves. Instead, the log's description of attachments simply refers to the privileged email to which it is attached and appears to invite an assumption that because the cover email is privileged, so is the attachment. The language that appears in the log, and that the Court today is deeming inadequate, is as follows:

- "Attachment to above email between IBM DiF research personnel and IBM in-house counsel seeking or providing information for legal advice regarding legal and regulatory compliance for research project"; and

- "Attachment to above email between IBM DiF research personnel and IBM in-house counsel seeking or providing legal advice regarding research project policies, licenses, and requirements."

*See* D.E. 92-7, passim. These attachments may well be privileged, but the Court has no idea whether they are, based on these entries, which describe only the cover email and not the attachments. Accordingly, IBM is ordered to serve a supplemental amended privilege log by the close of business on November 5, 2021, adequately identifying the basis for privilege claims over every attachment that is described now by the above-noted inadequate language.

**B.    Inadequacy of IBM's Response to Interrogatory No. 2 and Rule 26(a)(1) Initial Disclosures**

The Court dealt above in Part I with Interrogatory No. 2 at length in ruling on plaintiffs' first motion to compel (D.E. 73), but in the second motion, plaintiffs want to compel IBM to disclose persons with knowledge as to the spoliation allegations in Count VIII. More specifically, plaintiffs want the identities of persons who created and distributed the DRO, determined who at IBM should receive it, and implemented it or sought to implement it. Second Motion at 14. IBM has disclosed the identities of a number of non-attorney employees involved in the spoliation

matters. Second Response at 12-13. But IBM is refusing to supplement its response to Interrogatory No. 2, or its initial disclosure, to identify attorneys, either in-house or outside counsel, who fit the above description of persons involved in creation, distribution, and implementation of the DRO. *Id.* at 13. Plainly, IBM and its counsel are annoyed and indignant at the implication that the attorneys had anything to do with the spoliation, but they also argue that plaintiffs already know who the in-house and outside counsel for IBM are because IBM has disclosed those names in connection with the privilege log and during the ordinary course of litigation. *Id.* at 13-14.

The Court is resolving this dispute, consistent with Rule 26(b)(1) relevancy and proportionality, as follows: IBM is ordered to supplement its response to Interrogatory No. 2 with the names of the persons – including inside or outside counsel – who created and distributed the DRO, determined who at IBM should receive it, and implemented it or sought to implement it. No supplementation of the initial disclosure is ordered, as the foregoing supplementation of Interrogatory No. 2 is sufficient. If indeed plaintiffs already know who the attorneys are, IBM's naming of the attorneys will come as hardly a surprise to plaintiffs and will not impose a significant burden on IBM. And knowing who the attorneys are is not the same as knowing who among them handled the DRO for IBM.

IBM surely would rather not involve the attorneys as witnesses in the litigation, and the Court fully appreciates the unpleasantness of that prospect, but nor can the Court change the fact that IBM has admitted that the spoliation of the DiF Email Account and the XIV Hard Drive occurred after the litigation started. Plaintiffs' allegations about that spoliation, in Count VIII, remain in the case, and plaintiffs are entitled to relevant discovery on those allegations, including the identities of non-attorney and attorney personnel involved in the DRO's creation, distribution,

and implementation. IBM no doubt has concerns about whether inclusion of the attorneys will lead to depositions of the attorneys, and certainly naming them as potential witnesses in an interrogatory response is unusual. But the Court cautions plaintiffs and IBM that this may not be the case. All depends on how the additional document discovery pans out, and the question of whether plaintiffs could show that a deposition of any attorney is a relevant *and proportional* exercise in this matter is not yet decided, even as IBM is ordered to identify the attorneys in the interrogatory response. The Court fully expects that plaintiffs will not use deposition discovery as a tool to harass or pressure IBM, by creating pressure on the attorneys, and although this question is not before the Court today, the Court does not envision permitting such depositions unless a clear basis exists. The Court also fully expects that if IBM receives such deposition notices and believes the depositions should not take place, IBM will move for a protective order.

For now, though, all plaintiffs seek is the identification of the attorneys as among those involved in the document preservation or lack thereof in this matter – a subject squarely relevant to plaintiffs' claims in Count VIII and not disproportional so far under Rule 26(b)(1) because the plaintiffs are asking for only the names.

**CONCLUSION**

For the foregoing reasons, plaintiffs' first motion to compel (D.E. 73,74) is granted in part and denied in part as set forth above. Plaintiffs' second motion to compel (D.E. 92) is also granted in part and denied in part as set forth above. The parties are further ordered to confer under Rule 26(f) and submit a joint status report no later than noon on November 12, 2021, containing their proposed agreed or contested schedules for the completion of discovery in this matter in the wake

of the foregoing rulings on the two motions to compel.   The further discovery schedule and new cutoff date will be set after the Court receives the parties' input in the status report.

**SO ORDERED.**

ENTER:

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: October 26, 2021**